JOHNSON LAW FIRM
A Professional Corporation
FRANK J. JOHNSON (174882)
402 W. Broadway, 27th Floor
San Diego, CA 92101
Telephone: 619/230-0063
619/230-1839 (fax)
frank@johnsonlawfirmapc.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: 610/225-2677
610/225-2678 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C 06 4307

| | |
|---|---|
| JAMES L. FINN, Derivatively on Behalf of CNET NETWORKS, INC., | No. |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT, ACTION FOR ACCOUNTING AND VIOLATION OF CALIFORNIA CORPORATIONS CODE |
| vs. | |
| SHELBY W. BONNIE, GEORGE E. MAZZOTTA, BARRY D. BRIGGS, JOHN C. COLLIGAN, PETER L.S. CURRIE, JARL MOHN, BETSEY NELSON and ERIC ROBISON, | |
| Defendants, | |
| – and – | |
| CNET NETWORKS, INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of CNET Networks, Inc. ("CNET" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants"). This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior CNET insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to CNET insiders. Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to them since 1997.

2.     Between 1997 and the present, Defendants also caused CNET to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by CNET carried with them an exercise price that was *not less than* the fair market value of CNET stock on the date of grant and issuance.

3.     In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be *backdated* to dates when the Company's shares were trading at or near the lowest price for that relevant period. By May 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers which contributed to Defendants' ability to sell over $31.3 million worth of CNET stock.

4.     Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as California and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused CNET to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to

1    senior CNET executives; and (iii) subjected CNET to potential liability from regulators including

2    the SEC and the IRS.

3       5.     Defendants' gross mismanagement and malfeasance over the past decade has

4    exposed CNET and its senior executives to criminal and civil liability for issuing false and

5    misleading financial statements.   Specifically, Defendants caused or allowed CNET to issue

6    statements that failed to disclose or misstated the following: (i) that the Company had problems

7    with its internal controls that prevented it from issuing accurate financial reports and projections;

8    (ii) that because of improperly recorded stock-based compensation expenses, the Company's

9    financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the

10   Company's public disclosures presented an inflated view of CNET's earnings and earnings per

11   share.

12       6.     Defendants' malfeasance and mismanagement during the relevant period has

13   wreaked hundreds of millions of dollars of damages on CNET. The Company's senior executives

14   were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-

15   priced stock options and to issue false financial statements to cover up their misdeeds.

16   Defendants' breaches of fiduciary duties in the administration of the Company's stock option

17   plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to

18   the plans.   The Company has now been mentioned as one of several companies likely to have

19   manipulated options.   Meanwhile, certain of the Defendants, who received under-priced stock

20   options and/or knew material non-public information regarding CNET's internal control

21   problems, abused their fiduciary relationship with the Company by selling over $31.3 million

22   worth of their personally held shares at artificially inflated prices during the relevant period. This

23   action seeks recovery for CNET against these faithless fiduciaries, as CNET's Board of Directors,

24   as currently composed, is simply unable or unwilling to do so.

**INTRADISTRICT ASSIGNMENT**

26       7.     A substantial part of the events or omissions which give rise to the claims in this

27   action occurred in the county of San Francisco, and as such this action is properly assigned to the

28   San Francisco or Oakland divisions of this Court.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under California and Delaware law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

9.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

10.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.. CNET is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants are citizens of California and reside in this District.

## PARTIES

12.     Plaintiff James L. Finn is, and at all times relevant hereto was, a shareholder of nominal party CNET.  Plaintiff currently holds 600 shares of CNET stock.

13.     Nominal party CNET is a global media company and creator of authentic brand experiences in multiple content categories. The Company operates a number of Web sites, each with its own distinct brand, that deliver authentic brand experiences for both users and marketers.

14.     Defendant Shelby W. Bonnie ("Bonnie") has been Chairman of the Board of CNET since November 2000 and has served as Chief Executive Officer ("CEO") since March 2000. Bonnie co-founded CNET in 1993 and at all times has served as a director of the Company.

1   Bonnie had previously held the positions of Chief Operating Officer ("COO") and Chief Financial

2   Officer ("CFO") of CNET. At all relevant times, Bonnie actively participated in the management

3   of CNET's daily business affairs and finances. He also actively participated in the preparation,

4   review and approval of CNET's publicly reported financial results and financial statements for

5   1997-2006, as well as the corresponding reports on SEC Form 10-K and press releases. Based on

6   his knowledge of material non-public information regarding the Company, defendant Bonnie

7   violated Cal. Corp. Code §§25402 and 25502.5 by selling 1.8 million CNET shares for insider

8   trading proceeds of more than $21.4 million.

9       15.     Defendant George E. Mazzotta ("Mazzotta") joined CNET as CFO in July 2005.

10  At all relevant times, Mazzotta actively participated in the management of CNET's daily business

11  affairs and finances. He also actively participated in the preparation, review and approval of

12  CNET's publicly reported financial results and financial statements for 2005-2006, as well as the

13  corresponding report on SEC Form 10-K and press releases.

14      16.     Defendant Barry D. Briggs ("Briggs") is the President and COO of CNET. He was

15  appointed to this position effective October 2000 through the Company's acquisition of ZDNet.

16  At all relevant times, Briggs actively participated in the management of CNET's daily business

17  affairs and finances. He also actively participated in the preparation, review and approval of

18  CNET's publicly reported financial results and financial statements for 2000-2006, as well as the

19  corresponding report on SEC Form 10-K and press releases. Based on his knowledge of material

20  non-public information regarding the Company, defendant Briggs violated Cal. Corp. Code

21  §§25402 and 25502.5 by selling 495,000 CNET shares for insider trading proceeds of more than

22  $8.1 million.

23      17.     Defendant John C. Colligan ("Colligan") has been a director of the Company since

24  1996. During the relevant period, Colligan actively participated in the preparation, review and

25  approval of CNET's publicly reported financial results and financial statements for 1997-2006, as

26  well as the corresponding reports on SEC Form 10-K and press releases. Based on his knowledge

27  of material non-public information regarding the Company, defendant Colligan violated Cal.

28

1   Corp. Code §§25402 and 25502.5 by selling 85,000 CNET shares for insider trading proceeds of

2   $866,713 during the relevant period.

3       18.    Defendant Peter L.S. Currie ("Currie") has been a director of the Company since

4   December 2005.  During the relevant period, Colligan actively participated in the preparation,

5   review and approval of CNET's publicly reported financial results and financial statements for

6   2005-2006, as well as the corresponding report on SEC Form 10-K and press releases.

7       19.    Defendant Jarl Mohn ("Mohn") also known as Lee Masters, became a director of

8   CNET in December 2003.  During the relevant period, Colligan actively participated in the

9   preparation, review and approval of CNET's publicly reported financial results and financial

10  statements for 2003-2006, as well as the corresponding reports on SEC Form 10-K and press

11  releases.

12      20.    Defendant Betsey Nelson ("Nelson") has been a director of the Company since

13  December 2003.  During the relevant period, Nelson actively participated in the preparation,

14  review and approval of CNET's publicly reported financial results and financial statements for

15  2003-2006, as well as the corresponding reports on SEC Form 10-K and press releases.

16      21.    Defendant Eric Robison ("Robison") has been a director of the Company since

17  December 1994.  During the relevant period, Robison actively participated in the preparation,

18  review and approval of CNET's publicly reported financial results and financial statements for

19  1997-2006, as well as the corresponding reports on SEC Form 10-K and press releases.  Based on

20  his knowledge of material non-public information regarding the Company, defendant Robison

21  violated Cal. Corp. Code §§25402 and 25502.5 by selling 24,167 CNET shares for insider trading

22  proceeds of $900,512 during the relevant period.

23      22.    The defendants identified in ¶¶14 and 17-21 are referred to herein as the "Director

24  Defendants."  The defendants identified in ¶¶14-16 are referred to herein as the "Officer

25  Defendants."  The defendants identified in ¶¶14, 16-17 and 21 are referred to herein as the

26  "Insider Selling Defendants."

27

28

**DEFENDANTS' DUTIES**

23.     Each officer and director of CNET named herein owed the Company and CNET shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of CNET's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of CNET. Further, the misconduct of CNET's officers has been ratified by CNET's Board, which has failed to take any legal action on behalf of the Company against them.

24.     By reason of their positions as officers, directors and fiduciaries of CNET and because of their ability to control the business and corporate affairs of the Company, the Defendants owed CNET and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage CNET in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of CNET and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over CNET to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

25.     Because of their positions of control and authority as directors or officers of CNET, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; and (ii) willingness to cause CNET to disseminate false Proxy Statements for 1998-2005, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock options grants in order to manipulate the strike price of the stock options they received. Because of their positions with CNET, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose

1    these facts promptly and accurately to CNET shareholders and the financial markets but failed to

2    do so.

3         26.    Between 1998 and 2005, Defendants repeated in each Proxy Statement that the

4    stock option grants made during that period carried an exercise price that was *not less than* the

5    fair market value of CNET stock on the date granted, as calculated by the public trading price of

6    the stock at the market's close on that date.  However, Defendants concealed until May 2006 that

7    the stock option grants were repeatedly and consciously *backdated* to ensure that the strike price

8    associated with the option grants was at or near the lowest trading price for that fiscal period.  Due

9    to Defendants' breach of their fiduciary duty in the administration of the stock option plans,

10   plaintiff seeks to have the directors' and officers' plans voided and gains from those plans

11   returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised options

12   granted to Defendants between 1997 and 2002 cancelled, the financial gains obtained via the

13   exercise of such options returned to the Company and to have Defendants revise the Company's

14   financial statements to reflect the truth concerning these option grants.

15        27.    To discharge their duties, the directors of CNET were required to exercise

16   reasonable and prudent supervision over the management, policies, practices and controls of the

17   business and financial affairs of CNET.  By virtue of such duties, the officers and directors of

18   CNET were required, among other things, to:

19               (a)    manage, conduct, supervise and direct the business affairs of CNET in

20   accordance with all applicable law (including federal and state laws, government rules and

21   regulations and the charter and bylaws of CNET);

22               (b)    neither engage in self-dealing nor knowingly permit any officer, director or

23   employee of CNET to engage in self-dealing;

24               (c)    neither violate nor knowingly permit any officer, director or employee of

25   CNET to violate applicable laws, rules and regulations;

26               (d)    remain informed as to the status of CNET's operations, including its

27   practices in relation to the cost of allowing the pervasive backdating and improperly accounting

28   for such, and upon receipt of notice or information of imprudent or unsound practices, to make a

SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 7 -

1   for their duties to the Company and its shareholders, which Defendants were aware or should have

2   been aware posed a risk of serious injury to the Company. The conduct of the Defendants who

3   were also officers and/or directors of the Company during the relevant period has been ratified by

4   the Director Defendants who comprised CNET's entire Board during the relevant period.

5     29. Defendants breached their duties of loyalty and good faith by allowing or by

6   themselves causing the Company to misrepresent its financial results and prospects, as detailed

7   herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. In

8   addition, as a result of Defendants' illegal actions and course of conduct during the relevant

9   period, the Company is now the subject of an SEC investigation. As a result, CNET has expended

10   and will continue to expend significant sums of money. Such expenditures include, but are not

11   limited to:

12      (a) improvidently paid executive compensation;

13      (b) increased capital costs as a result of the loss of market capitalization and the

14   Company's damaged reputation in the investment community;

15      (c) professional costs associated with the SEC's inquiry;

16      (d) costs incurred to carry out internal investigations, including legal fees paid

17   to outside counsel; and

18      (e) incurring possible IRS penalties for improperly reporting compensation.

19     30. These actions have irreparably damaged CNET's corporate image and goodwill.

20   For at least the foreseeable future, CNET will suffer from what is known as the "liar's discount," a

21   term applied to the stocks of companies who have been implicated in illegal behavior and have

22   misled the investing public, such that CNET's ability to raise equity capital or debt on favorable

23   terms in the future is now impaired.

24       **AIDING AND ABETTING AND CONCERTED ACTION**

25     31. In committing the wrongful acts alleged herein, Defendants have pursued or joined

26   in the pursuit of a common course of conduct, and have acted in concert with one another in

27   furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as

28

1  giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in

2  breach of their respective duties.

3        32.    At relevant times, Defendants collectively and individually initiated a course of

4  conduct which was designed to and did: (i) conceal the fact that the Company was over-paying its

5  directors, officers and employees and improperly misrepresenting its financial results, in order to

6  allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain

7  Defendants' executive and directorial positions at CNET and the profits, power and prestige

8  which Defendants enjoyed as a result of these positions; (iii) deceive the investing public,

9  including shareholders of CNET, regarding Defendants' management of CNET's operations, the

10  Company's financial health and stability, and future business prospects, which had been

11  misrepresented by Defendants throughout the relevant period; and (iv) allow several of the

12  Company's officers and directors to sell millions of dollars worth of Company stock at inflated

13  prices. In furtherance of this course of conduct, Defendants collectively and individually took the

14  actions set forth herein.

15        33.    Defendants engaged in a common course of conduct commencing by at least 1997

16  and continuing thereafter. During this time, Defendants caused the Company to conceal the true

17  fact that CNET was over-compensating its directors, officers and employees and misrepresenting

18  its financial results. In addition, Defendants also made other specific, false statements about

19  CNET's financial performance and future business prospects, as alleged herein.

20        34.    The purpose and effect of Defendants' common enterprise and/or common course

21  of conduct was, among other things, to disguise Defendants' violations of law, breaches of

22  fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust

23  enrichment; to conceal adverse information concerning the Company's operations, financial

24  condition, and future business prospects; and to artificially inflate the price of CNET common

25  stock so they could: (i) dispose of millions of dollars of their own stock, and (ii) protect and

26  enhance their executive and directorial positions and the substantial compensation and prestige

27  they obtained as a result thereof.

28

35.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently grant under-priced stock options and to misrepresent its financial results. Because the actions described herein occurred under the authority of the Board of Directors, each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

36.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

37.     CNET is a global media company and creator of authentic brand experiences in multiple content categories. The Company operates a number of Web sites, each with its own distinct brand, that deliver authentic brand experiences for both users and marketers. The Company's network of sites is focused on four categories: technology, games and entertainment, business, and community.

38.     Throughout the relevant period, Defendants caused CNET to grant them millions of stock options permitting them to buy CNET's stock for pennies on the dollar which they could in turn sell as the Company's stock price increased. A stock option gives the holder the right to buy a stock at a certain price in the future. Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

39.     However, many of the millions of options granted to CNET's executives had a hidden, valuable component: they were misdated, often making them even more significantly valuable. The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (e.g., a decision in February to pick

1   a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was

2   finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant

3   on January 15, but there is a period after January 15 in which the grantor waits to see if a more

4   advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where

5   there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there

6   is a decision to issue a grant as of a certain date, but after that date there are changes in the

7   grantees or amounts to grantees, and although the work is not complete on those grants as of the

8   stated grant date, that date is nonetheless used).

9                              **STOCK OPTION GRANTS**

10  **1998 Option Grants**

11        40.    Defendants dated many of CNET's 1998 option grants as of June 3, 1998, at $8.06

12  per share (split adjusted) – nearly the low of the month when the stock traded between $8.02 and

13  $17.06. Former executive Halsey M. Minor ("Minor") received 1.2 million options at this price.

14  Minor, the founder of CNET, served as Chairman and CEO of the Company from the time he

15  founded the Company in December 1992 until his resignation in 2000.

16  **2000 Option Grants**

17        41.    Defendants dated CNET's 2000 option grants on several dates, all of which were at

18  the lowest price of the month in which the options were granted.  Defendants dated many of

19  CNET's 2000 options on or about April 17, 2000, at $24.63 per share – the lowest for the month

20  of April when the stock traded as high as $47.75 per share.  Defendant Bonnie received 200,000

21  shares at this price. Former CFO Douglas N. Woodrum ("Woodrum") received 125,000 shares at

22  this price and former COO Richard J. Marino ("Marino") received 200,000 shares at this price.

23  Defendants also dated many of CNET's 2000 options on or about October 18, 2000, at $18.88 per

24  share – the lowest for the month of October when the stock traded as high as $31.50 per share.

25  Defendant Briggs received 300,000 shares at this price.  Former President and director of CNET

26  Dan Rosensweig ("Rosensweig") received 700,000 options at this price and Former COO Marino

27  received 150,000 options at this price.

28

**2001 Option Grants**

42.     Defendants dated CNET's 2001 option grants as of October 8, 2001, at $3.42 per share – nearly the low of the month when the stock traded between $3.20 and $5.99.  Defendants Bonnie and Briggs received 400,000 and 215,000 shares, respectively, at this price.  Former executives Rosenweig, Woodrum and Art Fatum received 245,000, 170,000 and 90,000 shares, respectively, at this price.

43.     Below are several of CNET's grants which occurred right before significant stock price increases:



CNET
May 2, 1998 - July 6, 1998



CNET
March 17, 2000 - May 17, 2000

CNET
September 18, 2000 - November 17, 2000



**CNET**
September 7, 2001 - November 8, 2001

44.    Complicating matters and magnifying the harm to CNET, during the relevant period, CNET's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

45.    Specifically, in many instances the reported dates CNET stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.  In almost every case of misdating, the price of

1  CNET shares on the reported option-grant date was lower than the share price on the actual day

2  the options were issued.

3      46.    Through their fiduciary duties of care, good faith and loyalty, Defendants owed to

4  CNET a duty to ensure that the Company's financial reporting fairly presented, in all material

5  respects, the operations and financial condition of the Company. In order to adequately carry out

6  these duties, it is necessary for the Defendants to know and understand the material non-public

7  information to be either disclosed or omitted from the Company's public statements. This

8  material non-public information included the problems CNET faced because of its deficient

9  internal controls. Furthermore, defendants Mohn, Nelson and Robison, as members of the Audit

10  Committee during the relevant period, had a special duty to know and understand this material

11  information as set out in the Audit Committee's charter, which provides that the Audit Committee

12  is responsible for reviewing, in conjunction with management, the Company's policies generally

13  with respect to the Company's earnings press releases and with respect to financial information

14  and earnings guidance provided to analysts and rating agencies. Defendants Bonnie, Mazzotta

15  and Briggs, as officers of CNET, had ample opportunity to discuss this material information with

16  their fellow officers at management meetings and via internal corporate documents and reports.

17  Moreover, defendants Bonnie, Colligan, Currie, Mohn, Nelson and Robison, as directors of

18  CNET, had ample opportunity to discuss this material information with fellow directors at any of

19  the scores of Board meetings that occurred during the relevant period as well as at committee

20  meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or

21  intentionally caused or allowed, by their actions or inactions, the misleading statements to be

22  disseminated by CNET to the investing public and the Company's shareholders during the

23  relevant period.

24      47.    Specifically, since 1997, Defendants caused CNET to report false and misleading

25  financial results which materially understated its compensation expenses and thus overstated its

26  earnings as follows:

27

28

| Fiscal Year | Reported Earnings (in thousands) | Reported Diluted EPS |
|---|---|---|
| 1997 | (24,728) | ($0.44) |
| 1998 | 3,023 | $0.04 |
| 1999 | 416,908 | $5.05 |
| 2000 | (483,980) | ($5.18) |
| 2001 | (1,989,488) | $(14.52) |
| 2002 | (360,585) | $(2.60) |
| 2003 | (26,290) | $(0.19) |
| 2004 | 11,685 | $0.08 |
| 2005 | 27,693 | $0.18 |

48. Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated. In fact, non-employee members of CNET's Board of Directors received most of their compensation for serving as Board members in the form of stock options. Under CNET's Stock Incentive Plan, non-employee directors automatically received an initial stock option grant of 40,000 CNET shares. Thereafter, they are entitled to receive an additional annual grant of 15,000 options to purchase shares of the Company's common stock. The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period. In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

49. Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $31.3 million worth of CNET stock they had obtained – often by cashing in under-priced stock options:

| Defendant | Dates of Sales | Shares Sold | Proceeds Received |
|---|---|---|---|
| Bonnie | 02/04/04 – 02/28/06 | 1,800,540 | $21,430,647 |
| Briggs | 11/01/00 – 02/09/06 | 495,000 | $8,157,345 |
| Colligan | 11/25/03 – 08/01/05 | 85,000 | $866,713 |
| Robison | 11/09/99 – 11/09/00 | 24,167 | $900,512 |
| TOTAL | | 2,404,707 | $31,355,217 |

50. On May 16, 2006, CNET's stock dropped as the Center for Financial Research and Analysis ("CFRA") published a report on stock option backdating which listed CNET as a company at risk for such practices. Later, in response to the CFRA Report, CNET announced that it had began an internal investigation into the Company's past option granting practices.

51.    Then, on May 24, 2006, CNET announced that the SEC had opened an informal inquiry into the Company's past stock option grants.

52.    In effect, during the relevant period, the Defendants caused CNET's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed CNET to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of CNET's earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

53.    Plaintiff brings this action derivatively in the right and for the benefit of CNET to redress injuries suffered and to be suffered by CNET as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

54.    Plaintiff will adequately and fairly represent the interests of CNET and its shareholders in enforcing and prosecuting its rights.

55.    Plaintiff is an owner of CNET stock and was an owner of CNET stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

56.    Based upon the facts set forth throughout this Complaint, a pre-filing demand upon the CNET Board of Directors to institute this action against the officers and members of the CNET Board of Directors is excused as futile. A pre-filing demand would be a useless and futile act because:

(a)    The members of CNET's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves

1   and/or their fellow directors and allies in the top ranks of the corporation for the violations of law

2   complained of herein. These are people they have developed professional relationships with, who

3   are their friends and with whom they have entangling financial alliances, interests and

4   dependencies, and therefore, they are not able to and will not vigorously prosecute any such

5   action.

6          (b)   The CNET Board of Directors and senior management participated in,

7   approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts

8   to conceal or disguise those wrongs from CNET's stockholders or recklessly and/or consciously

9   negligently disregarded the wrongs complained of herein, and are therefore not disinterested

10  parties. As a result of their access to and review of internal corporate documents, conversations

11  and connections with other corporate officers, employees, and directors, and attendance at

12  management and/or Board meetings, each of the Defendants knew the adverse non-public

13  information regarding the improper stock option grants and financial reporting. Pursuant to their

14  specific duties as Board members, Defendants are charged with the management of the Company

15  and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to

16  CNET in that they failed to prevent and correct the improper stock option granting and financial

17  reporting. Certain directors are also dominated and controlled by other Defendants and cannot act

18  independently of them. Thus, the CNET Board cannot exercise independent objective judgment

19  in deciding whether to bring this action or whether to vigorously prosecute this action because

20  each of its members participated personally in the wrongdoing or are dependent upon other

21  Defendants who did.

22         (c)   The acts complained of constitute violations of the fiduciary duties owed by

23  CNET's officers and directors and these acts are incapable of ratification.

24         (d)   The members of CNET's Board have benefited, and will continue to

25  benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their

26  positions of control and the perquisites derived thereof, and are incapable of exercising

27  independent objective judgment in deciding whether to bring this action.

28

1      (e)     Any suit by the current directors of CNET to remedy these wrongs would

2   likely further expose the liability of Defendants under the federal securities laws, which could

3   result in additional civil and/or criminal actions being filed against one or more of the Defendants,

4   thus, they are hopelessly conflicted in making any supposedly independent determination on

5   whether to sue themselves.

6      (f)     CNET has been and will continue to be exposed to significant losses due to

7   the wrongdoing complained of herein, yet CNET's Board has not filed any lawsuits against

8   Defendants or others who were responsible for that wrongful conduct to attempt to recover for

9   CNET any part of the damages CNET suffered and will suffer thereby.

10      (g)     In order to properly prosecute this lawsuit, CNET's directors would have to

11   sue themselves and the other Defendants, requiring them to expose themselves and their comrades

12   to millions of dollars in civil liability and/or sanctions, while the SEC's inquiry is still underway.

13   This they will not do.

14      (h)     CNET's current and past officers and directors are protected against

15   personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in

16   this Complaint by directors' and officers' liability insurance which they caused the Company to

17   purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of

18   CNET.  However, due to certain changes in the language of directors' and officers' liability

19   insurance policies in the past few years, the directors' and officers' liability insurance policies

20   covering the Defendants in this case contain provisions which eliminate coverage for any action

21   brought directly by CNET against these Defendants, known as, *inter alia*, the "insured versus

22   insured exclusion." As a result, if these directors were to sue themselves or certain of the officers

23   of CNET, there would be no directors' and officers' insurance protection and thus, this is a further

24   reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively,

25   as this action is brought, such insurance coverage exists and will provide a basis for the Company

26   to effectuate a recovery.

27      (i)     To bring this action for breaching their fiduciary duties, the members of the

28   CNET Board would have been required to sue themselves and/or their fellow directors and allies

1    in the top ranks of the Company, who are their personal friends and with whom they have

2    entangling financial alliances, interests and dependencies, which they would not do.

3        57.    Plaintiff has not made any demand on shareholders of CNET to institute this action

4    since such demand would be a futile and useless act for the following reasons:

5        (a)    CNET is a publicly traded company with approximately 149 million shares

6    outstanding, and thousands of shareholders;

7        (b)    Making demand on such a number of shareholders would be impossible for

8    plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders;

9    and

10       (c)    Making demand on all shareholders would force plaintiff to incur huge

11   expenses, assuming all shareholders could be individually identified.

12   **THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT**
     **ON CNET'S FINANCIAL STATEMENTS**

13   **The FY 1997 Form 10-K**

14       58.    On or about March 31, 1998, the Company filed its FY 1997 Form 10-K with the

15   SEC. The FY 1997 Form 10-K was simultaneously distributed to shareholders and the public.

16   The FY 1997 Form 10-K included CNET's FY 1997 financial statements which were materially

17   false and misleading and presented in violation of GAAP, due to improper accounting for the

18   backdated stock options. As a result, CNET's compensation expense was understated and its net

19   earnings were overstated.

20   **The FY 1998 Form 10-K**

21       59.    On or about April 1, 1999, the Company filed its FY 1998 Form 10-K with the

22   SEC. The FY 1998 Form 10-K was simultaneously distributed to shareholders and the public.

23   The FY 1998 Form 10-K included CNET's FY 1998 financial statements which were materially

24   false and misleading and presented in violation of GAAP, due to improper accounting for the

25   backdated stock options. As a result, CNET's compensation expense was understated and its net

26   earnings were overstated.

27

28

**The FY 1999 Form 10-K**

60.    On or about March 30, 2000, the Company filed its FY 1999 Form 10-K with the SEC. The FY 1999 Form 10-K was simultaneously distributed to shareholders and the public. The FY 1999 Form 10-K included CNET's FY 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The FY 2000 Form 10-K**

61.    On or about April 2, 2001, the Company filed its FY 2000 Form 10-K with the SEC. The FY 2000 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2000 Form 10-K included CNET's FY 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The 2001 Form 10-K**

62.    On or about April 31, 2002, the Company filed its FY 2001 Form 10-K with the SEC. The FY 2001 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2001 Form 10-K included CNET's FY 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The 2002 Form 10-K**

63.    On or about March 30, 2003, the Company filed its FY 2002 Form 10-K with the SEC. The FY 2002 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2002 Form 10-K included CNET's FY 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The 2003 Form 10-K**

64.    On or about February 27, 2004, the Company filed its FY 2003 Form 10-K with the SEC. The FY 2003 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2003 Form 10-K included CNET's FY 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The 2004 Form 10-K**

65.    On or about March 16, 2005, the Company filed its FY 2004 Form 10-K with the SEC. The FY 2004 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2004 Form 10-K included CNET's FY 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

**The 2005 Form 10-K**

66.    On or about March 16, 2006, the Company filed its FY 2005 Form 10-K with the SEC. The FY 2005 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2005 Form 10-K included CNET's FY 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, CNET's compensation expense was understated and its net earnings were overstated.

67.    The materially false and misleading 1997-2005 Form 10-Ks described above were reviewed, prepared and/or endorsed by the Director Defendants. The 2000-2005 Form 10-Ks were signed by defendant Bonnie as Chairman of the Board and CEO of CNET. Additionally, Bonnie signed the 1997-1999 Form 10-Ks as COO of CNET. The 2005 Form 10-K was signed by defendant Mazzotta as the CFO. The 1997-1999 Form 10-Ks were signed by former Chairman and CEO Minor. The 1997-2004 Form 10-Ks were signed by former CFO Woodrum.

**DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

68.     The 1998-2005 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1998 and 2006. In fact, it was not until the CFRA report that shareholders learned that the Proxy Statements which they had relied upon for nearly a decade were false and misleading. Defendants have been unjustly enriched at the expense of CNET, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

69.     Then, on May 16, 2006, CNET's stock dropped as a result of the CFRA report on stock option backdating which listed CNET as a company at risk for such practices. Later, in response to the CFRA Report, CNET announced that it had began an internal investigation into the Company's past option granting practices.

70.     Later, on May 24, 2006, CNET announced that the SEC had opened an informal inquiry into the Company's past stock option grants.

71.     Each dollar diverted to Defendants via the option backdating scheme has come at the expense of the Company. For example, if Bonnie's 200,000 options granted in April 2000 had not been manipulated, but rather had a strike price of $36.05, the average for the month, instead of the $24.63 strike price, when Bonnie exercised those options the Company would receive $7.2 million instead of $4.9 million – a cost to the Company of $2.3 million for this single instance of option backdating.

**THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT**

72.     Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions. Given the many times CNET's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

73.     As a result of the backdating of options, Defendants have been unjustly enriched at the expense of CNET, which has received and will receive less money from Defendants when

1  they exercise their options at prices substantially lower than they would have if the options had

2  not been backdated.

### TOLLING OF THE STATUTE OF LIMITATIONS

4    74.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully

concealed their manipulation of the stock option plans, through strategic timing and fraudulent

backdating, by issuing false and misleading Proxy Statements, by falsely reassuring CNET's

public investors that CNET's option grants were being administered by a committee of

independent directors, and by failing to disclose that backdated options were, in fact, actually

issued on dates other than those disclosed, and that strategically timed option grants were issued

based on the manipulation of insider information that ensured that the true fair market value of the

Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

12    75.    CNET's public investors had no reason to know of the Defendants' breaches of

their fiduciary duties until May 2006, when CFRA published a report detailing the option

practices of CNET and other companies.

15    76.    Finally, as fiduciaries of CNET and its public shareholders, the Defendants cannot

rely on any limitations defense where they withheld from CNET's public shareholders the facts

that give rise to the claims asserted herein, *i.e.,* that the CNET Board had abdicated its fiduciary

responsibilities to oversee the Company's executive compensation practices, and that the option

grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly,

to maximize the costs for the Company.

### COUNT I

### Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against All Defendants

77.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

78.    Throughout the relevant period, Defendants individually and in concert, directly

and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the

1    mails, engaged and participated in a continuous course of conduct designed to divert hundreds of

2    millions of dollars to Defendants via improper option grants.

3          79.    Defendants employed devices, schemes and artifices to defraud while in possession

4    of material, adverse non-public information and engaged in acts, practices and a course of conduct

5    that included the making of, or participation in the making of, untrue and/or misleading statements

6    of material facts and/or omitting to state material facts necessary in order to make the statements

7    made about CNET not misleading.

8          80.    Defendants, as top executive officers and directors of the Company, are liable as

9    direct participants in the wrongs complained of herein.  Through their positions of control and

10   authority as officers of the Company, each of the Defendants was able to and did control the

11   conduct complained of herein and the content of the public statements disseminated by CNET.

12         81.    Defendants acted with scienter throughout the relevant period, in that they either

13   had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein,

14   or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true

15   facts, even though such facts were available to them.  Defendants were among the senior

16   management of the Company, and were therefore directly responsible for the false and misleading

17   statements and/or omissions disseminated to the public through press releases, news reports and

18   filings with the SEC.

19         82.    Each of the Defendants participated in a scheme to defraud with the purpose and

20   effect of defrauding CNET.

21         83.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act,

22   and Rule 10b-5 promulgated thereunder.

### COUNT II

### Violations of §14(a) of the Exchange Act Against
### All Defendants

26         84.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

85. Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

86. The 1998-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing CNET to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1997.

87. In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

88. The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

89. The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Violations of §20(a) of the Exchange Act Against All Defendants

90. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91. Defendants, by virtue of their positions with CNET and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CNET within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause CNET to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Accounting

92.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.    At all relevant times, Defendants, as directors and/or officers of CNET, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

94.    In breach of their fiduciary duties owed to CNET and its shareholders, the Defendants caused CNET, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of CNET.  By this wrongdoing, the Defendants breached their fiduciary duties owed to CNET and its shareholders.

95.    The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

96.    As a result of Defendants' misconduct, CNET has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

97.    Plaintiff demands an accounting be made of all stock options grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

### COUNT V

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    Each of the Defendants agreed to and did participate with Bonnie and Briggs and the other Defendants and/or aided and abetted one another in a deliberate course of action

1    designed to divert corporate assets in breach of the fiduciary duties the Defendants owed to the

2    Company.

3          100.    The Defendants have violated fiduciary duties of care, loyalty, candor and

4    independence owed to CNET and its public shareholders, have engaged in unlawful self-dealing

5    and have acted to put their personal interests and/or their colleagues' interests ahead of the

6    interests of CNET and its shareholders.

7          101.    As demonstrated by the allegations above, Defendants failed to exercise the care

8    required, and breached their duties of loyalty, good faith, candor and independence owed to

9    CNET and its public shareholders, and they failed to disclose material information and/or made

10   material misrepresentations to shareholders regarding Defendants' option backdating scheme.

11         102.    By reason of the foregoing acts, practices and course of conduct, the Defendants

12   have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations

13   toward CNET and its public shareholders.

14         103.    As a proximate result of Defendants' conduct, in concert with Bonnie and Briggs,

15   CNET has been injured and is entitled to damages.

16                                        **COUNT VI**

17                        **Abuse of Control Against All Defendants**

18         104.    Plaintiff incorporates by reference and realleges each and every allegation set forth

19   above, as though fully set forth herein.

20         105.    The Defendants employed the alleged scheme for the purpose of maintaining and

21   entrenching themselves in their positions of power, prestige and profit at, and control over, CNET,

22   and to continue to receive the substantial benefits, salaries and emoluments associated with their

23   positions at CNET. As a part of this scheme, Defendants actively made and/or participated in the

24   making of or aided and abetted the making of, misrepresentations regarding CNET.

25         106.    Defendants' conduct constituted an abuse of their ability to control and influence

26   CNET.

27         107.    By reason of the foregoing, CNET has been damaged.

28

**COUNT VII**

**Gross Mismanagement Against All Defendants**

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.   Defendants had a duty to CNET and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of CNET.

110.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of CNET in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of CNET's affairs and in the use and preservation of CNET's assets.

111.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused CNET to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to CNET, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged CNET.

112.   By reason of the foregoing, CNET has been damaged.

**COUNT VIII**

**Constructive Fraud Against All Defendants**

113.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.   As corporate fiduciaries, Defendants owed to CNET and its shareholders a duty of candor and full accurate disclosure regarding the true state of CNET's business and assets and their conduct with regard thereto.

115.   As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from CNET's

1  shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship

2  of CNET. Thus they have committed constructive fraud and violated their duty of candor.

3        116.   By reason of the foregoing, CNET has been damaged.

## COUNT IX

### Corporate Waste Against All Defendants

6        117.   Plaintiff incorporates by reference and realleges each and every allegation set forth

7  above, as though fully set forth herein.

8        118.   By failing to properly consider the interests of the Company and its public

9  shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

10 Defendants via the option backdating scheme, Defendants have caused CNET to waste valuable

11 corporate assets.

12       119.   As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT X

### Unjust Enrichment Against All Defendants

15       120.   Plaintiff incorporates by reference and realleges each and every allegation set forth

16 above, as though fully set forth herein.

17       121.   As a result of the conduct described above, Defendants will be and have been

18 unjustly enriched at the expense of CNET, in the form of unjustified salaries, benefits, bonuses,

19 stock option grants and other emoluments of office.

20       122.   Certain Defendants also obtained severance benefits that were not earned or

21 justified but were instead paid as part of a scheme to cover up Defendants' complicity in the

22 scheme.

23       123.   All the payments and benefits provided to the Defendants were at the expense of

24 CNET. The Company received no benefit from these payments. CNET was damaged by such

25 payments.

26       124.   Certain of the Defendants sold CNET stock for a profit during the period of

27 deception, misusing confidential non-public corporate information. These Defendants should be

28 required to disgorge the gains which they have and/or will otherwise unjustly obtain at the

1  expense of CNET.  A constructive trust for the benefit of the Company should be imposed

2  thereon.

### COUNT XI

#### Against the Officer Defendants for Rescission

125.  Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

126.  As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and CNET entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by CNET shareholders and filed with the SEC.

127.  All contracts which provide for stock option grants between the Officer Defendants and CNET and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

### COUNT XII

#### Against the Insider Selling Defendants for Violation of California Corporations Code §25402

128.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.  At the time that the Insider Selling Defendants sold their CNET common stock as set forth herein at ¶49, by reason of their high executive and/or directorial positions with CNET, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of CNET's improper accounting.

130.   At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of CNET shares at that time.

131.   The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their CNET common stock in California in violation of California Corporations Code §25402.

132.   Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to CNET for damages in an amount up to three times the difference between the price at which CNET common stock was sold by these Defendants, and each of them, and the market value which CNET common stock would have had at the time of the sale if the information known to these Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT XIII

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

133.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold CNET common stock on the basis of such information.

135.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold CNET common stock.

136.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of CNET common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

137.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.   Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.   Directing CNET to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)   a proposal requiring that the office of CEO of CNET and Chairman of the CNET Board of Directors be permanently held by separate individuals and that the Chairman of the CNET Board meets rigorous "independent" standards;

(ii)   a proposal to strengthen the CNET Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)   appropriately test and then strengthen the internal audit and control functions;

(iv)   rotate independent auditing firms every five years;

1                 (v)        control and limit insider stock selling and the terms and timing of

2 stock option grants; and

3                 (vi)       reform executive compensation.

4      D.     Ordering the imposition of a constructive trust over Defendants' stock options and

5 any proceeds derived therefrom;

6      E.     Awarding punitive damages;

7      F.     Awarding costs and disbursements of this action, including reasonable attorneys',

8 accountants', and experts' fees; and

9      G.     Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

10

11      Plaintiff demands a trial by jury.

12 DATED: July /3 2006              JOHNSON LAW FIRM, A P.C.

13

14

15                              FRANK J. JOHNSON

16                     402 W. Broadway, 27th Floor

17                     San Diego, CA 92101
                        Telephone: 619/230-0063
                    619/230-1839 (fax)

18

19                     THE WEISER LAW FIRM, P.C.
                    ROBERT B. WEISER

20                     121 N. Wayne Avenue, Suite 100
                    Wayne, PA 19087

21                     Telephone: 610/225-2677
                    610/225-2678 (fax)

22                     Attorneys for Plaintiff

23

24

25

26

27

28

## CNET NETWORKS, INC. VERIFICATION

I, James L. Finn, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: _June 13, 2006_          _James L. Finn_
                                SIGNATURE

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3   named parties, there is no such interest to report.

4

5

6        ATTORNEY OF RECORD FOR PLAINTIFF
         JAMES L. FINN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28